IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| KAYLA BUMPUS, | |
| Plaintiff, | CIVIL ACTION FILE NO. |
| v. | 1:16-CV-1209-TWT-JFK |
| NATIONAL CREDIT SYSTEMS, INC., | |
| Defendant. | |

## **FINAL REPORT AND RECOMMENDATION**

Plaintiff Kayla Bumpus filed the above-styled action against Defendant National Credit Systems, Inc. ("NCS"), on April 14, 2016. [Doc. 1]. Plaintiff Bumpus alleges that Defendant NCS negligently or willfully violated 15 U.S.C. § 1681s-2(b) of the Fair Credit Reporting Act ("FCRA") by failing to conduct a reasonable investigation of Plaintiff's disputes of information furnished to credit reporting agencies and by failing to correct inaccurate information furnished to credit reporting agencies. [Doc. 1 ¶¶ 23-25]. Plaintiff seeks actual damages, statutory damages, punitive damages, and attorney's fees. [Id.]. On March 17, 2017, Defendant NCS moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 on Plaintiff's FCRA claim

based upon the pleadings, statements of material facts, exhibits, and discovery materials submitted to the court. [Doc. 48].

## I.   Facts

When evaluating the merits of a motion for summary judgment, the court must "view the evidence and all factual inferences raised by it in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-moving party." Comer v. City of Palm Bay, Florida, 265 F.3d 1186, 1192 (11th Cir. 2001). However, mere conclusions and unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment. See Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005). Therefore, the evidence presented by the parties having been evaluated in accordance with the foregoing principles, the following facts are deemed to be true for the limited purpose of evaluating Defendant's motion [Doc. 48] for summary judgment.

On or about February 7, 2013, Plaintiff Kayla Bumpus entered into a one-year lease with JAI Property Management ("JAI") for a home on Maple Valley Court in Union City, Georgia. [Doc. 50-1, Defendant's Statement of Material Facts ("DSMF") ¶ 1; Doc. 48-6, Ex. D]. The lease included monthly rent in the amount of $850 as well as a security deposit of $850 which, in the event the lease was breached, would be

applied to unpaid rent, late fees, or "damage to the apartment beyond ordinary wear and tear." [DSMF ¶ 2; Doc. 48-6, Ex. D ¶¶ 1, 7; Doc. 53, Plaintiff's Response ("Pla. Resp.") to DSMF ¶ 2]. The terms of the lease provided that upon early termination of the lease, Plaintiff was required to: a. pay all monies currently due; b. pay all sums due through the end of the notice period of 60 days; c. pay an additional termination fee of $850 (one month's rent); and d. forfeit any security deposit. [DSMF ¶ 3; Doc. 48-6, Ex. D ¶ 6]. Joshua Vance was Plaintiff's co-tenant. [Plaintiff's Statement of Material Facts ("PSMF") ¶ 6; Plaintiff's Affidavit ("Pla. Aff.") ¶ 9; Vance Aff. ¶ 5].

Within a few months after Plaintiff moved in, the apartment was burglarized twice. [PSMF ¶ 1; Pla. Aff. ¶ 4; Doc. 48-5, Plaintiff's Deposition ("Pla. Dep.") at 20]. Plaintiff also encountered maintenance issues with the air conditioning unit, which broke down on multiple occasions. [PSMF ¶ 2; Pla. Aff. ¶ 5; Pla. Dep. at 20-21]. Plaintiff testified, "This created particular problems for me because my son has asthma, a condition that is aggravated by the heat." [Pla. Aff. ¶ 5]. Plaintiff testified that because she feared for their safety and her son's health and because she was frustrated with the ongoing maintenance issues at the apartment, she decided to terminate her lease early. [PSMF ¶ 3; Pla. Aff. ¶ 6; Pla. Dep. at 20-21]. On or about June 20, 2013, Plaintiff contacted JAI representative D.J. Mathew by email regarding

3

termination of the lease.  [DSMF ¶ 4; Doc. 48-7, Ex. E].  Mr. Mathew wrote Plaintiff

the following, in part:

> If you guys move out by June 30th, you will not have to pay for July rent
> because you are not in the property.  As I told Josh [Vance], please make
> sure to do a walkthrough with Sam by the 1st or 2nd of July. . . .  You will
> have 60 days to pay the lease cancellation fee of $850.00, if it is not paid
> within the 60 days, it will be sent to collections.  If you guys do have to
> stay some days in July, you will have to pay the prorated amount for the
> days in the property.  If you guys stay in the property in July and the rent
> is not paid, I will have to file for eviction by the 10th.

[Doc. 48-7, Ex. E].

Plaintiff testified that she sent an email to Mr. Mathew on July 4, 2013, which

stated: "We will vacate the property by the 10th of July.  Per our previous conversation

we will pay the cancellation fee of 850 in 60 days.  And the 10 days we stayed here

should be paid by the credit of no a/c for half of the month last month."  [Pla. Aff. ¶

7, Ex. A].  Plaintiff and her co-tenant, Mr. Vance, testified that they moved out of the

apartment over the weekend of July 6-7, 2013.  [PSMF ¶ 6; Pla. Aff. ¶ 9; Vance Aff.

¶ 5].  Plaintiff and Mr. Vance also testified that they left the apartment clean, in good

order, and undamaged except for ordinary wear and tear.  [PSMF ¶ 7; Pla. Aff. ¶ 9;

Vance Aff. ¶ 5].  According to Plaintiff, although she was supposed to have access to

4

the apartment through July 10, 2013, JAI had the locks changed and, as a result, Plaintiff was unable to access the apartment after July 7.  [PSMF ¶ 8; Pla. Aff. ¶ 10].

Plaintiff testified that JAI did not conduct a final inspection of the apartment after she moved out and did not provide her with a final list of damages to the apartment.  [PSMF ¶ 9; Pla. Aff. ¶ 10].  JAI does not know whether a move out inspection was ever conducted on the apartment or whether a final list of damages to the apartment was ever compiled.  [PSMF ¶ 10; Doc. 55-3, Mathew Deposition ("Mathew Dep.") at 22-23, 40-41].  JAI did not return Plaintiff's $850 security deposit.  [PSMF ¶ 13; DSMF ¶ 2].

According to Defendant NCS, Plaintiff left an account balance of $2,734.70 after her $850 security deposit was applied to the balance.  [Doc. 48-8, Ex. F].  The balance included pro-rated July rent of $302, a June 2013 late fee of $52.50, a July 2013 late fee of $30.20, a lease termination fee of $1,700, and a maintenance fee of $1,500.  [DSMF ¶ 5; Doc. 48-8, Ex. F].  The maintenance fee of $1,500 allegedly covered the costs for damages, painting, cleaning, and removing trash.  [Mathew Dep. at 22; Doc. 48-8, Ex. F].  JAI was unable to confirm the costs for cleaning the apartment or the costs to remedy any alleged damages caused by Plaintiff and her co-tenant.  [PSMF ¶ 12; Mathew Dep. at 44-52].  Plaintiff and Mr. Vance testified that in

5

late August or early September 2013, they paid JAI the agreed upon early termination fee of $850 and that the payment was made by two money orders each in the amount of $425.  [PSMF ¶ 14; Pla. Aff. ¶ 8; Vance Aff. ¶ 4].  Plaintiff testified that over the next year, she heard nothing from JAI.  [PSMF ¶ 15; Pla. Aff. ¶ 11].

On or about August 25, 2014, JAI placed Plaintiff's account ("the debt") in the amount of $2,734.70 with Defendant NCS for collection.  [DSMF ¶ 6].  NCS began collection efforts and sent a collection letter to Plaintiff on or about August 28, 2014. [DSMF ¶ 7].  Plaintiff testified that in August of 2014, she was denied a student loan to attend law school because of derogatory information that Defendant NCS had placed on her credit report, claiming that Plaintiff owed JAI over $2,700.  [PSMF ¶ 16; Pla. Aff. ¶¶ 11, 12; Pla. Dep. at 29, 32, 37-38].  Plaintiff promptly exercised her rights under the FCRA, specifically 15 U.S.C. §§ 1681i(a) and 1681s-2(b), by disputing the accuracy of the information that Defendant NCS placed on her credit reports with Equifax, Trans Union, and Experian.  [PSMF ¶ 17].

On or about September 8, 2014, Plaintiff contacted NCS by telephone and disputed the debt.  She was asked to provide documentation of her dispute.  [DSMF ¶ 14].  Plaintiff testified that on or about November 24, 2014, she emailed NCS' Collections Manager, Mike Cook, a copy of the June and July 2013 email exchange

6

with Mr. Mathew regarding the termination of Plaintiff's lease and the corresponding amounts due.  [DSMF ¶ 15; PSMF ¶ 18; Pla. Aff. ¶¶ 7, 14, Ex. A].  Mr. Cook forwarded this email to NCS Service Representative Katie March, who reviewed the emails received from Plaintiff, the lease agreement, the final account statement, and NCS' account notes.  [DSMF ¶ 16; Doc. 48-4, Ex. B, March Deposition ("March Dep.") at 18, 24-26, 31; Doc. 48-11, Ex. I].

On November 25, 2014, Ms. March contacted Mr. Mathew to confirm the balance due on the account and forwarded a copy of Plaintiff's email regarding the termination fee to Mr. Mathew for his review.  [DSMF ¶ 17; March Dep. at 18-20; Doc. 48-12, Ex. J].  Mr. Mathew responded and indicated that the balance should be reduced by $850, from $2,734.70 to $1,884.70, in accordance with the June 20, 2013, email exchange.  [DSMF ¶ 18; Doc. 48-7, Ex. E; Doc. 48-12, Ex. J].  Subsequently, JAI reduced the amount of Plaintiff's alleged debt by $850, from $2,734.70 to $1,884.70.  [PSMF ¶ 20; Mathew Dep. at 26-27].  Ms. March adjusted the balance in NCS' account system and sent Plaintiff a letter reflecting the updated balance of $1,884.70.  [DSMF ¶ 19; March Dep. at 21-22].  As noted *supra*, the majority of the $1,884.70 alleged debt was attributable to a $1,500 maintenance fee for cleaning, damages, and maintenance to the apartment.  [PSMF ¶ 21].

7

On or about December 1, 2014, Defendant NCS received an Automated Consumer Dispute Verification ("ACDV") from Equifax which contained a dispute code indicating: "013 – Disputes current balance – verify original loan amount, scheduled monthly payment amount, actual payment amount, amount past due, current balance." [DSMF ¶ 20; Doc. 48-13, Ex. K]. The ACDV listed a second dispute code: "012 – claims paid the original creditor before collection status or charge off. Verify account status, payment rating, current balance." [DSMF ¶ 21; Doc. 48-13, Ex. K]. On or about December 29, 2014, NCS received an ACDV from Experian which contained a dispute code indicating: "109 – Disputes all amounts. Verify all amounts." [DSMF ¶ 25; Doc. 48-14, Ex. L]. On or about February 2, 2015, NCS received an ACDV from Experian which contained a dispute code indicating: "112 – Claims inaccurate information; Did not provide specific dispute; Please provide complete ID and verify account information." [DSMF ¶ 29; Doc. 48-15, Ex. M].

More than seven months later, on or about September 28, 2015, Defendant NCS received an ACDV from Equifax which contained a dispute code indicating: "013 – Disputes current balance – verify original loan amount, scheduled monthly payment amount, actual payment amount, amount past due, current balance." [DSMF ¶ 33; Doc. 48-16, Ex. N]. The ACDV listed a second dispute code: "012 – claims paid the

8

original creditor before collection status or charge off; Verify account status, payment rating, current balance."  [DSMF ¶ 34; Doc. 48-16, Ex. N].  On or about October 26, 2015, NCS received an ACDV from Equifax which contained a dispute code indicating: "003 – Consumer not liable for account (i.e. ex-spouse, business).  If liable provide complete ID and ECOA code."  [DSMF ¶ 38; Doc. 48-17, Ex. O].  On or about January 19, 2016, NCS received an ACDV from Equifax which contained a dispute code indicating: "003 – Consumer not liable for account (I.E. ex-spouse, business). If liable provide complete ID and ECOA code."  [DSMF ¶ 42; Doc. 48-18, Ex. P].

Ron Sapp, Defendant NCS' Vice President of Operations, testified that NCS does not use its own personnel to conduct reinvestigations of consumer disputes that it receives from the credit reporting agencies.  [PSMF ¶ 25].  For the last ten years and at all times relevant to this dispute, NCS has outsourced its reinvestigations under 15 U.S.C. § 1681s-2(b) to a company in India called Blaise Information Systems ("Blaise").  [PSMF ¶ 26].  After Defendant NCS received the various ACDVs, Blaise allegedly conducted reinvestigations which were guided by the dispute codes.  [DSMF ¶¶ 22, 26, 30, 35, 39, 43; Sapp Deposition ("Sapp Dep.") at 72-75; Doc. 48-9, Ex. G]. Blaise allegedly reviewed the information provided by the credit reporting agencies and the account file, including any updated information found in NCS' account notes.

[DSMF ¶¶ 23, 27, 31, 36, 40, 44].  Blaise employees did not communicate with Plaintiff or her co-tenant, Mr. Vance, when conducting the reinvestigations of Plaintiff's disputes.  [PSMF ¶¶ 33, 34; Pla. Aff. ¶ 22; Vance Aff. ¶ 7].

In or around January 2016, Plaintiff applied to the State Bar of Georgia and listed the JAI debt in response to question 15.3: "Have you ever had any type of account or debt turned over to a collection agency or an account that has been charged off?" [PSMF ¶ 37].  Plaintiff informed the bar examiners that the JAI debt was in the "dispute process." [PSMF ¶ 38].  The bar examiners sent a communication to Plaintiff stating, "It will be necessary for you to provide proof of arrangements, six consecutive months of payments and/or settlement letters according to the Board's policy concerning the item(s) you listed in answer to question 15.3." [PSMF ¶ 39; Pla. Aff. ¶ 18; Doc. 48-19, Ex. Q].  Plaintiff testified that she was also denied a student loan because of Defendant's reporting of the JAI debt to the credit reporting agencies. [PSMF ¶ 44; Pla. Dep. at 29, 32, 37-38; Pla. Aff. ¶¶ 11, 12, Ex. B].

In March 2016, Plaintiff applied to lease an apartment at the Camden Vantage Apartments in Atlanta.  Plaintiff was required to post a security deposit equal to one month's rent, which was $1,259.  [PSMF ¶ 41; Pla. Aff. ¶ 19].  The security deposit requirement that Camden Vantage imposed on Plaintiff was expressly identified by

10

Camden Vantage as an "adverse action," and Camden Vantage provided Plaintiff notice of this adverse action in compliance with the FCRA, specifically 15 U.S.C. § 1681m(a).  [PSMF ¶ 42].  In its adverse action notice, Camden Vantage identified the following as factors that resulted in the adverse action: Plaintiff's unsatisfactory credit history; her unsatisfactory rent-to-income ratio; and her unsatisfactory or insufficient credit score.  [PSMF ¶ 43; Doc. 48-21, Ex. S].

On or about March 10, 2016, Plaintiff paid NCS the debt of $942.35 that was allegedly owed to JAI.  [PSMF ¶ 40; Pla. Aff. ¶ 18; Sapp Dep. at 85].  As of March 29, 2016, Plaintiff's Equifax credit report showed that a debt of $942 was "unpaid" and owed to JAI.  The Equifax report showed that the original amount owed on the debt was $1,884.  [Pla. Aff. ¶ 23, Ex. E, Doc. 55-1 at 24].

Additional facts will be set forth as necessary during discussion of Plaintiff's FCRA claim.

## II.    Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (amended 2010). Rule 56(a) "mandates the entry of summary judgment, after adequate

11

time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552 (1986).  The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. See Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2511 (1986).

The movant bears the initial burden of asserting the basis of its motion, and that burden is a light one.  See Celotex, 106 S. Ct. at 2553.  The movant is not required to negate its opponent's claim.  See id.  Rather, the movant may discharge this burden merely by "'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." Id. at 2554.

When evaluating a motion for summary judgment, the court must view the evidence and factual inferences in the light most favorable to the nonmoving party. See Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1309 (11th Cir. 2001). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986).  Instead, "the nonmoving party

12

must present evidence beyond the pleadings showing that a reasonable jury could find in its favor." <u>Fickling v. United States</u>, 507 F.3d 1302, 1304 (11th Cir. 2007) (citing <u>Walker v. Darby</u>, 911 F.2d 1573, 1577 (11th Cir. 1990)).

The court will apply these standards in ruling on Defendant's motion for summary judgment.

## III.   Discussion

### A.   Defendant NCS' Investigation of Plaintiff's Disputes

The FCRA requires "consumer reporting agencies [to] adopt reasonable procedures for meeting the needs of commerce for consumer credit . . . in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681(b). "To achieve its purpose, the FCRA places distinct obligations on three types of entities: consumer reporting agencies ('CRAs'), users of consumer reports, and furnishers of information to CRAs." <u>Ware v. Bank of America Corp.</u>, 9 F. Supp. 3d 1329, 1337 (N.D. Ga. 2014) (citing <u>Chipka v. Bank of America</u>, 355 Fed. Appx. 380, 382 (11th Cir. 2009); 15 U.S.C. §§ 1681b, 1681m, 1681s-2). As Defendant NCS acknowledges, the company is a furnisher of information to Equifax, Trans Union, and

Experian, and NCS furnished information to the three CRAs about Plaintiff's account with JAI.  [PSMF ¶¶ 16, 17].

"The FCRA imposes two separate duties on furnishers.  First, § 1681s-2(a) requires furnishers to submit accurate information to CRAs.  Second, § 1681s-2(b) requires furnishers to investigate and respond promptly to notices of customer disputes."  Green v. RBS National Bank, 288 Fed. Appx. 641, 642 (11th Cir. 2008).  No private right of action is available for violations of § 1681s-2(a).  See Steed v. EverHome Mortg. Co., 308 Fed. Appx. 364, 369-70 (11th Cir. 2009).  "Enforcement of this provision is limited to federal agencies, federal officials, and state officials."  Green, 288 Fed. Appx. at 642 n.2 (citing 15 U.S.C. §§ 1681s–2(c), (d); 15 U.S.C. § 1681s(c)(1)(B)).

Plaintiff Kayla Bumpus alleges in her complaint that Defendant "NCS negligently or willfully" violated 15 U.S.C. § 1681s-2(b) of the FCRA. [Doc. 1].  "The FCRA does provide consumers with a private right of action for a violation of § 1681s-2(b), but only if the furnisher received notice of the consumer's dispute from a CRA."  Ware, 9 F. Supp. 3d at 1338 (citing Green, 288 Fed. Appx. at 642).  The parties acknowledge that Defendant NCS received notice of Plaintiff's disputes from CRAs on numerous occasions.  In December 2014, NCS received notices in the form of

14

ACDVs from Equifax and Experian.  [DSMF ¶¶ 20, 25; Doc. 48-13, Ex. K; Doc. 48-14, Ex. L].  NCS also received ACDVs from Experian in February 2015 and from Equifax in September 2015, October 2015, and January 2016  [DSMF ¶¶ 29, 33, 34, 38, 42; Doc. 48-15, Ex. M; Doc. 48-16, Ex. N; Doc. 48-17, Ex. O; Doc. 48-18, Ex. P].

Section 1681s-2(b)(1) provides that after the furnisher has received notice "of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency," the furnisher is required to: "(A) conduct an investigation with respect to the disputed information; (B) review all relevant information provided by the consumer reporting agency . . . ; [and] (C) report the results of the investigation to the consumer reporting agency[.]"  15 U.S.C. § 1681s-2(b)(1).  If "the investigation finds that the information is incomplete or inaccurate," the furnisher must "report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis[.]"  15 U.S.C. § 1681s-2(b)(1)(D).  The FCRA also provides that "if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation . . . for purposes of reporting to a consumer reporting agency only," the furnisher must "promptly – (i) modify that item of information; (ii) delete that item of information;

15

or (iii) permanently block the reporting of that item of information."  15 U.S.C. §

1681s-2(b)(1)(E).[1]  Defendant NCS argues that summary judgment is warranted on

Plaintiff's FCRA claim which is brought pursuant to § 1681s-2(b).  [Doc. 50-2 at 4-

19].  The court finds Defendant's arguments to be unpersuasive.

    Section "1681s-2(b) requires some degree of careful inquiry by furnishers of

information.  In particular, when a furnisher does not already possess evidence

establishing that an item of disputed information is true, § 1681s–2(b) requires the

furnisher to seek out and obtain such evidence before reporting the information as

_____

[1]Defendant argues that Plaintiff's FCRA claim cannot survive summary judgment because NCS' reporting of information to the CRAs was accurate. [Doc. 50-2 at 5-7].  But as 15 U.S.C. § 1681s-2(b)(1)(E) provides, a furnisher is required to take certain action, not only if an item of information is found to be inaccurate, but if it "cannot be verified" after reinvestigation.  In support of Defendant's "accuracy" argument, counsel for Defendant quotes 15 U.S.C. § 1681s-2 and then cites to Farmer v. Phillips Agency, Inc., 285 F.R.D. 688, 698 (N.D. Ga. 2012), for the proposition that the FCRA "implicitly requires that a consumer must present evidence tending to show that a [furnisher] prepared a report containing 'inaccurate' information" in order to sustain a claim. [Doc. 50-2 at 5].  But Farmer was not addressing 15 U.S.C. § 1681s-2 and the duties imposed on furnishers.  Id., 285 F.R.D. at 698.  Instead, Farmer was addressing the duties imposed on CRAs by 15 U.S.C. § 1681e(b), which provides, "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  Yet Defendant's counsel substitutes the word "furnisher" for "CRA" in the Farmer quote and frames the quote so as to give the appearance that the Farmer court was addressing furnishers and 15 U.S.C. § 1681s-2.  The court trusts that counsel's misquoting of Farmer was the result of a misunderstanding rather than an attempt to deceive.

16

'verified.'" Hinkle v. Midland Credit Mgmt., Inc., 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted). "Section 1681s-2(b) does not impose an unduly burdensome investigation requirement on furnishers; rather, it presents them with a choice regarding how they handle disputed information." Id. After conducting an investigation, the furnisher can either: (1) verify the disputed information and report to the CRAs that the information has been verified; or (2) conclude that the disputed information is unverifiable. Id. Furnishers can choose the second option "if they determine that the evidence necessary to verify disputed information either does not exist or is too burdensome to acquire. Having made such a determination, furnishers are entitled to cease investigation and notify the CRAs that the information 'cannot be verified.'" Id. (quoting 15 U.S.C. § 1681s-2(b)(1)(E)).

In the present case, Defendant NCS apparently chose the first option. The company does not allege that it ever concluded that the disputed information was unverifiable. After NCS was notified by the CRAs that information regarding Plaintiff's account with JAI was being disputed by Plaintiff, NCS allegedly conducted a reinvestigation. Although unclear, it appears that Defendant NCS alleges that it verified the disputed information and reported to the CRAs that the information had

17

been verified.[2]  [DSMF ¶¶ 23, 24, 27, 28, 31, 32, 36, 37, 40, 41, 45].  The court next turns to whether Defendant NCS' reinvestigation was reasonable.

The Eleventh Circuit has explained that a furnisher is able to satisfy its burden of conducting a reasonable investigation and verifying the disputed information "by uncovering documentary evidence that is sufficient to prove that the information is true" or "by relying on personal knowledge sufficient to establish the truth of the information." Hinkle, 827 F.3d at 1303 (citations omitted).  "When a furnisher reports that disputed information has been verified, the question of whether the furnisher behaved reasonably will turn on whether the furnisher acquired sufficient evidence to support the conclusion that the information was true.  This is a factual question, and it will normally be reserved for trial." Id. (citation omitted).  Defendant NCS argues that the "record evidence shows clearly that, for each dispute received by NCS, it conducted a reasonable reinvestigation." [Doc. 50-2 at 13].  According to Defendant, Plaintiff's disputes merely required NCS to review documents in the account notes,

_____

[2]This is unclear because NCS repeatedly asserts that it "reviewed," "updated," and "confirmed" various pieces of information.  [DSMF ¶¶ 23, 24, 27, 28, 31, 32, 36, 37, 40, 41, 45].  But Defendant NCS does not specifically assert that it verified the disputed information and reported to the CRAs that the information had been verified. However, the court will assume for purposes of evaluating the summary judgment motion that Defendant at least alleges that it took these actions.

18

confirm the account balance, and confirm that the debt to JAI was still due and owing. [Id. at 10-14].

The relevant evidence reveals that in February 2013, Plaintiff Bumpus entered into a one-year lease with JAI for a home in Union City. [DSMF ¶ 1; Doc. 48-6, Ex. D]. The lease included monthly rent in the amount of $850 as well as a security deposit of $850 which, in the event the lease was breached, would be applied to unpaid rent, late fees, or "damage to the apartment beyond ordinary wear and tear." [DSMF ¶ 2; Doc. 48-6, Ex. D ¶¶ 1, 7; Pla. Resp. to DSMF ¶ 2]. The terms of the lease provided that upon early termination of the lease, Plaintiff was required to, *inter alia*, pay a termination fee of $850. [DSMF ¶ 3; Doc. 48-6, Ex. D ¶ 6]. In June 2013, Plaintiff decided to terminate her lease early and contacted JAI representative D.J. Mathew by email. [PSMF ¶ 3; Pla. Aff. ¶ 6; Pla. Dep. at 20-21; DSMF ¶ 4; Doc. 48-7, Ex. E]. Plaintiff and her co-tenant, Mr. Vance, testified that they moved out of the apartment over the weekend of July 6-7, 2013, and that they left the apartment clean, in good order, and undamaged except for ordinary wear and tear. [PSMF ¶¶ 6, 7; Pla. Aff. ¶ 9; Vance Aff. ¶ 5]. Plaintiff testified that JAI did not conduct a final inspection of the apartment after she moved out. Plaintiff also testified that JAI did not provide

her with a final list of damages to the apartment. [PSMF ¶ 9; Pla. Aff. ¶ 10]. JAI did not return Plaintiff's $850 security deposit. [PSMF ¶ 13; DSMF ¶ 2].

According to Defendant NCS, Plaintiff left an account balance of $2,734.70 after her $850 security deposit was applied to the balance. [Doc. 48-8, Ex. F]. The balance included, *inter alia*, a lease termination fee of $1,700, instead of the agreed upon $850, and a maintenance fee of $1,500. [DSMF ¶ 5; Doc. 48-8, Ex. F]. The maintenance fee of $1,500 allegedly covered the costs for damages, painting, cleaning, and removing trash. [Mathew Dep. at 22; Doc. 48-8, Ex. F]. Plaintiff and Mr. Vance testified that in late August or early September 2013, they paid JAI the agreed upon early termination fee of $850 and that the payment was made by two money orders each in the amount of $425. [PSMF ¶ 14; Pla. Aff. ¶ 8; Vance Aff. ¶ 4].

On or about August 25, 2014, JAI placed Plaintiff's account in the amount of $2,734.70 with Defendant NCS for collection. [DSMF ¶ 6]. NCS began collection efforts, and, on or about August 28, 2014, the company sent a collection letter to Plaintiff regarding the debt. [DSMF ¶ 7]. After Plaintiff contacted NCS and disputed the debt in September and November 2014, JAI reduced the amount of Plaintiff's alleged debt by $850, from $2,734.70 to $1,884.70. [PSMF ¶ 20; Mathew Dep. at 26-27]. In December 2014, NCS received notices in the form of ACDVs from Equifax

20

and Experian.  [DSMF ¶¶ 20, 25; Doc. 48-13, Ex. K; Doc. 48-14, Ex. L].  NCS also received ACDVs from Experian in February 2015 and from Equifax in September 2015, October 2015, and January 2016  [DSMF ¶¶ 29, 33, 34, 38, 42; Doc. 48-15, Ex. M; Doc. 48-16, Ex. N; Doc. 48-17, Ex. O; Doc. 48-18, Ex. P].  The CRAs informed NCS that Plaintiff disputed a number of pieces of information in the credit report, including the balance allegedly owed on the debt.  Plaintiff also claimed that she had paid JAI before the debt was sent into collection.  [DSMF ¶¶ 20, 21, 25, 29, 33, 34, 38, 42; Doc. 48-13, Ex. K; Doc. 48-14, Ex. L; Doc. 48-15, Ex. M; Doc. 48-16, Ex. N; Doc. 48-17, Ex. O; Doc. 48-18, Ex. P].

As noted *supra*, Defendant NCS allegedly conducted an investigation in response to the ACDVs, verified the disputed information, and reported to the CRAs that the information had been verified.  However, Ron Sapp, NCS' Vice President of Operations, testified that the company does not use its own personnel to conduct reinvestigations of consumer disputes it receives from the CRAs. [PSMF ¶ 25].  At all times relevant to this dispute, Defendant NCS has outsourced its reinvestigations under 15 U.S.C. § 1681s-2(b) to Blaise Information Systems, which is located in India. [PSMF ¶ 26].  After Defendant NCS received the various ACDVs, Blaise allegedly conducted reinvestigations which were guided by the dispute codes. [DSMF ¶¶ 22, 26,

AO 72A
(Rev.8/82)

30, 35, 39, 43; Sapp Dep. at 72-75; Doc. 48-9, Ex. G].  Blaise allegedly reviewed the information provided by the CRAs and the account file, including any updated information found in NCS' account notes.  [DSMF ¶¶ 23, 27, 31, 36, 40, 44].

Although Defendant NCS contends that it conducted reasonable reinvestigations into Plaintiff's disputes, NCS is unable to provide any information about the actual reinvestigations.  NCS only offered testimony about the procedures used by Blaise when conducting reinvestigations.  Mr. Sapp was asked and testified to the following about the way Blaise generally handles reinvestigations:

> A.  Blaise will go into e-Oscar, review the dispute, review all the information on hand, ensure that we're collecting everything that we had, that we've already done an investigation with the original creditor, and then respond to it. . . .
>
> Q.  And Blaise would have conducted the entirety of the reinvestigation; correct?
>
> A.  Correct. . . .
>
> Q.  And do you know who the person at Blaise was who actually conducted the reinvestigation?
>
> A.  No, I do not.
>
> Q.  Do you have any way to determine who at Blaise conducted the reinvestigation?
>
> A.  No.

[Sapp Dep. at 73-74].  Mr. Sapp testified that NCS provided some training and instructions to Blaise on how to handle reinvestigations, but he did not explain what

training was provided.  In fact, Mr. Sapp could not even recall if the training was in writing.  [Sapp Dep. at 75-76].

Defendant NCS has not offered any documentation regarding the reinvestigations allegedly conducted by Blaise.  NCS cannot identify any of the Blaise employees who actually conducted the reinvestigations of Plaintiff's disputes.  [PSMF ¶ 28; Sapp Dep. at 73-74].  NCS does not know how much time Blaise employees spent reinvestigating Plaintiff's disputes.  [PSMF ¶ 29; Sapp Dep. at 76-77].  In addition, Blaise did not report to NCS how it reinvestigated Plaintiff's disputes and Blaise employees did not communicate with Plaintiff or her co-tenant, Mr. Vance, when conducting the reinvestigations.  [PSMF ¶¶ 33, 34; Pla. Aff. ¶ 22; Vance Aff. ¶ 7; Sapp Dep. at 76-77].  Given the paucity of evidence regarding Blaise's alleged actions, the court finds that a reasonable jury could conclude that Defendant NCS did not conduct a reasonable investigation into Plaintiff's disputes.

Other evidence in the record casts doubt on the reasonableness of NCS' reinvestigations.  As previously noted, Plaintiff disputed information in her credit reports, including the balance allegedly owed on the debt to JAI.[3]  [DSMF ¶¶ 20, 21,

---

[3]The court also notes that although Defendant NCS contends that Plaintiff did not pay the early termination fee of $850 after Plaintiff moved out of the apartment, both Plaintiff and Mr. Vance testified that in late August or early September 2013, they

25, 29, 33, 34, 38, 42; Doc. 48-13, Ex. K; Doc. 48-14, Ex. L; Doc. 48-15, Ex. M; Doc. 48-16, Ex. N; Doc. 48-17, Ex. O; Doc. 48-18, Ex. P].  The majority of the $1,884.70 alleged debt was attributable to a $1,500 maintenance fee for cleaning, damages, painting, and removing trash.  [Mathew Dep. at 22; Doc. 48-8, Ex. F].   The maintenance fee was added to Plaintiff's balance after she moved out of the apartment. [DSMF ¶ 5; Doc. 48-8, Ex. F].

JAI was unable to confirm the costs for cleaning the apartment or the costs to remedy any alleged damages caused by Plaintiff and her co-tenant.  [PSMF ¶ 12; Mathew Dep. at 44-52].  Plaintiff testified that JAI did not conduct a final inspection of the apartment after she moved out and did not provide her with a final list of damages to the apartment.  [PSMF ¶ 9; Pla. Aff. ¶ 10].  A JAI "Move In/Move Out Inspection" form reveals that a few items of damage are recorded on the "Move In Inspection" portion of the form.  [Doc. 55-8, Ex. I].  The signature of Plaintiff, her co-tenant Mr. Vance, and a landlord representing JAI are on the form and are dated

---

paid JAI the agreed upon early termination fee of $850.  [PSMF ¶ 14; Pla. Aff. ¶ 8; Vance Aff. ¶ 4; DSMF ¶ 3; Doc. 48-6, Ex. D ¶ 6].

February 7, 2013.[4]  [Id.].  However, on the "Move Out Inspection" portion of the form,

nothing is listed and there are no signatures.  [Id.].

Defendant NCS has not submitted any documentation showing that a "Move Out

Inspection" form was completed.  Furthermore, JAI does not know whether a move out

inspection was ever conducted on the apartment or whether a final list of damages to

the apartment was ever compiled.  [PSMF ¶ 10; Mathew Dep. at 22-23, 40-41].  JAI

representative D.J. Mathew, who corresponded with Plaintiff via email around the time

she moved out of the apartment, was asked and testified to the following:

> Q.    And what was the [$1,500] maintenance fee for?
> A.    Removing trash, paint, touch up, minor repairs.
> Q.    All right.  Well, the reference number there says: "Paint, clean, remove trash," right?
> A.    Yes.
> Q.    And – and did you input that?
> A.    I can't recall.
> Q.    Okay.  Did you inspect the premises?
> A.    I can't recall.
> Q.    Do you know who did inspect the premises?
> A.    I can't recall.
> Q.    When this maintenance fee was assessed, did you provide any notice to Ms. Bumpus that the fee was being assessed?
> A.    I can't recall.

---

[4]Plaintiff points out that in its interrogatory responses, Defendant NCS stated that the move in inspection form was reviewed as part of the reinvestigation of Plaintiff's disputes.  [Doc. 55 at 13; Doc. 55-4, Ex. D].

> Q.   Do you know if anybody at JAI Properties provided Ms. Bumpus
>      with notice that that maintenance fee was being assessed?
> A.   I can't recall.

[Mathew Dep. at 22-23].

In sum, Plaintiff disputed the balance allegedly owed on the debt to JAI and this dispute was reported to Defendant NCS from the CRAs.  [DSMF ¶¶ 20, 21, 25, 29, 33, 34, 38, 42; Doc. 48-13, Ex. K; Doc. 48-14, Ex. L; Doc. 48-15, Ex. M; Doc. 48-16, Ex. N; Doc. 48-17, Ex. O; Doc. 48-18, Ex. P].  The majority of the $1,884.70 alleged debt was attributable to a $1,500 maintenance fee for cleaning, damages, and maintenance to the apartment.  [PSMF ¶ 21].  However, JAI does not know whether a move out inspection was ever conducted on the apartment or whether a final list of damages to the apartment was ever compiled, and Defendant NCS has not pointed to any evidence showing that the $1,500 maintenance fee was able to be verified.  [PSMF ¶ 10; Mathew Dep. at 22-23, 40-41].  In addition, Defendant NCS outsourced the reinvestigations of Plaintiff's disputes to Blaise, but NCS cannot identify any facts regarding how Blaise actually conducted the reinvestigations.  [PSMF ¶¶ 28, 29, 33, 34; Sapp Dep. at 73-77].  In light of these facts, the undersigned concludes that a reasonable jury could find that Defendant NCS did not conduct a reasonable investigation into Plaintiff's disputes and that the company did not behave reasonably

26

when it allegedly reported to the CRAs that the disputed information had been verified. See Hinkle, 827 F.3d at 1303.

### B.  Plaintiff's Claim of a Willful Violation of the FCRA

Plaintiff's complaint alleges that Defendant "NCS negligently or willfully" violated 15 U.S.C. § 1681s-2(b).  [Doc. 1].  Defendant NCS makes a brief argument that Plaintiff, in support of her claim for punitive damages, has failed to show that NCS engaged in a "willful" violation of the FCRA.  [Doc. 50-2 at 14].  The undersigned finds this argument lacking.  In Safeco Ins. Co. of America v. Burr, 127 S. Ct. 2201, 2208 (2007), the Supreme Court held that liability under § 1681n(a) for "willfully fail[ing] to comply" with the FCRA extends not only to acts known to violate the FCRA but to the reckless disregard of a statutory duty.

As discussed *supra*, Plaintiff disputed the amount of debt owed to JAI.  After Defendant NCS received notice of Plaintiff's disputes from the CRAs, NCS reported the debt as verified based on reinvestigations allegedly conducted by a company called Blaise.  However, NCS cannot identify any of the Blaise employees who conducted the reinvestigations and NCS does not know how much time Blaise employees spent on the reinvestigations.  Blaise also did not report to NCS how it reinvestigated Plaintiff's disputes, and Blaise employees did not communicate with Plaintiff or her

27

co-tenant when conducting the reinvestigations.  [PSMF ¶¶ 28, 29, 33, 34; Sapp Dep. at 73-77; Pla. Aff. ¶ 22; Vance Aff. ¶ 7].  Defendant NCS allegedly provided some training and instructions to Blaise on how to handle reinvestigations, but there is no evidence in the record about what training was provided or even if the training was in writing.  [Sapp Dep. at 75-76].  Moreover, although the majority of the debt that Plaintiff allegedly owed to JAI was attributable to a $1,500 maintenance fee, there is no indication that the fee could be verified through a move out inspection form, a final list of damages, or any other supporting documentation.  [PSMF ¶¶ 10, 21; Mathew Dep. at 22-23, 40-41].

In light of these facts, the court concludes that "a reasonable jury could find that [NCS] either knowingly or recklessly reported debts as 'verified' without obtaining sufficient documentation to support that determination."  Hinkle, 827 F.3d at 1307 (citing Safeco, 127 S. Ct. at 2208).  Because a genuine issue of material fact exists with respect to whether Defendant NCS willfully failed to comply with the FCRA, Plaintiff may be "entitled to recover statutory damages between $100 and $1,000, in addition to attorneys' fees and costs and 'such amount of punitive damages as the court may allow.'"  Rambarran v. Bank of America, N.A., 609 F. Supp. 2d 1253, 1270 (S.D. Fla.

28

2009) (quoting 15 U.S.C. § 1681n).  Summary judgment is not warranted on this aspect of Plaintiff's FCRA claim.

### C.     Plaintiff's Claim of a Negligent Violation of the FCRA

"A successful plaintiff in an action brought pursuant to the FCRA may recover his actual damages sustained as a result of the credit furnisher's negligent failure to comply with the law, along with the costs of the action and reasonable attorneys fees." King v. Asset Acceptance, LLC, 452 F. Supp. 2d 1272, 1280 (N.D. Ga. 2006) (citing 15 U.S.C. § 1681o).  Defendant NCS argues that it is entitled to summary judgment on Plaintiff's claim that Defendant negligently violated the FCRA because Plaintiff cannot present evidence of actual damages caused by NCS.  [Doc. 50-2 at 14-19].  The court disagrees.

On or about March 10, 2016, Plaintiff paid NCS the debt of $942.35 that was allegedly owed to JAI.  [PSMF ¶ 40; Pla. Aff. ¶ 18; Sapp Dep. at 85].  But as previously discussed, a reasonable jury could find that Plaintiff did not owe the alleged debt.  JAI had added a $1,500 maintenance fee to Plaintiff's balance shortly after she moved out of the apartment, but there is no documentation supporting this fee and Defendant NCS has not pointed to any evidence showing that the fee was able to be verified.  [PSMF ¶¶ 10, 21; Mathew Dep. at 22-23, 40-41].  Plaintiff notes that she is

29

seeking to recover the amount she paid to JAI as economic damages. [Doc. 55 at 22-23].

Plaintiff also alleges that in March 2016, she applied to lease an apartment at the Camden Vantage Apartments in Atlanta and was required to post a security deposit equal to one month's rent, which was $1,259. [PSMF ¶ 41; Pla. Aff. ¶ 19]. The security deposit requirement that Camden Vantage imposed on Plaintiff was expressly identified as an "adverse action," and Camden Vantage provided Plaintiff notice of this adverse action in compliance with the FCRA, specifically 15 U.S.C. § 1681m(a). [PSMF ¶ 42]. In its adverse action notice, Camden Vantage identified the following as factors that resulted in the adverse action: Plaintiff's unsatisfactory credit history; her unsatisfactory rent-to-income ratio; and her unsatisfactory or insufficient credit score. [PSMF ¶ 43; Doc. 48-21, Ex. S]. Given the fact that Camden Vantage's adverse action was based on Plaintiff's credit reports and took place after Defendant NCS allegedly failed to conduct a reasonable investigation into Plaintiff's disputes, the court finds that Plaintiff has carried her "burden of demonstrating the existence of damages resulting from an alleged FCRA violation[.]" Rambarran, 609 F. Supp. 2d at 1262-63. A reasonable jury could conclude that Defendant's alleged violation of the FCRA played a part in Camden Vantage's decision to require the security deposit.

30

Plaintiff also alleges that as a result of Defendant NCS' alleged negligent violations of the FCRA, she suffered emotional distress.  [Doc. 55 at 23, 25].  A plaintiff "may recover actual damages for any negligent violation of FCRA, including damages for humiliation, mental distress or injury to reputation and creditworthiness." Smith v. E-Backgroundchecks.com, Inc., 81 F. Supp. 3d 1342, 1365 (N.D. Ga. 2015) (citation, internal quotation marks, and alterations omitted).  "Many courts have not hesitated to find that mental distress damages were warranted for negligent violations of the FCRA even when the plaintiff has not shown to have obtained medical care or suffered any physical injury." Carlisle v. National Commercial Servs., Inc., 2017 WL 1075088, at *15 (N.D. Ga. February 22, 2017), report and recommendation adopted by 2017 WL 1049454 (N.D. Ga. March 20, 2017) (citations omitted).

In the present case, Plaintiff has offered allegations that as a result of dealing with the alleged debt and the repeated dispute process, she had trouble sleeping and was nervous, anxious, and depressed.  [Pla. Aff. ¶ 21].  According to Plaintiff, she had difficulty focusing on her school work and studying for the bar exam.  [Id.].  Plaintiff also alleges that she suffered humiliation when the alleged debt threatened to prevent or delay her from taking the bar exam, which in turn, threatened her ability to become a lawyer.  [Id.].  Finally, Plaintiff alleges that she was humiliated when she was forced

31

to disclose the issue to her parents and borrow money from them. [Id.].  In light of this evidence, and given the other actual damages allegedly caused by NCS' violation of the FCRA, the court finds that Plaintiff's testimony is sufficient to create a genuine issue of material fact as to whether she suffered emotional distress as a result of Defendant's actions. See Carlisle, 2017 WL 1075088, at *15; Smith, 81 F. Supp. 3d at 1366 (citation omitted) ("[V]iewing the evidence in the light most favorable to plaintiff, the Court concludes that plaintiff's evidence of damages for emotional distress and harm to his reputation are sufficient to create a question of fact for the jury[.]").  Therefore, summary judgment is not warranted on this claim.

The court, however, agrees with Defendant NCS that Plaintiff may not recover for damages as a result of being denied a student loan in 2014.  According to Plaintiff, she was denied a student loan in August of 2014 because of derogatory information that NCS had placed on her credit report, claiming that Plaintiff owed JAI over $2,700. [PSMF ¶ 16; Pla. Aff. ¶¶ 11, 12; Pla. Dep. at 29, 32, 37-38, 47].  But Plaintiff is unable to show that these damages were sustained as a result of Defendant NCS' alleged violations of the FCRA.  See King, 452 F. Supp. 2d at 1280.  Plaintiff's claim in this case is that NCS violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation of her disputes after being notified by the CRAs of the disputed debt.

32

[Doc. 1].  Plaintiff's damages in being denied a student loan in August 2014 could not have resulted from Defendant's alleged violations of the FCRA because Defendant did not receive notice from the CRAs of Plaintiff's disputes until December 2014.[5] [DSMF ¶¶ 20, 21, 25].  Plaintiff was denied the loan *before* Defendant's alleged failure to conduct a reasonable investigation of her disputes.  As a result, no reasonable jury could find that these damages resulted from Defendant's violations of 15 U.S.C. § 1681s-2(b).  See Davenport v. Sallie Mae, Inc., 124 F. Supp. 3d 574, 582 (D. Md. 2015), aff'd, 623 Fed. Appx. 94 (4th Cir. 2015) ("Davenport cannot recover for harms that occurred prior to the violation, i.e., prior to Navient's failure to conduct a reasonable investigation upon receipt of the disputes in August and October 2010. . . .  Navient's purported violation of the FCRA for failing to reasonably investigate Davenport's dispute in August 2010 could not have caused his loss of credit in June or July 2010.") (citing Van Veen v. Equifax Information, 844 F. Supp. 2d 599, 609 (E.D. Pa. 2012)); Rambarran, 609 F. Supp. 2d at 1264 ("Plaintiff admits . . . that the damages he claims in relation to his alleged inability to purchase a business condominium occurred prior to March 9, 2006, the first day that Bank of America

---

[5]Defendant also notes that record evidence reveals that Plaintiff's debt was not reported to the CRAs until November 2014.  [Doc. 50-2 at 15; Sapp Dep. at 59; Doc. 48-9, Ex. G].

33

could have possibly breached any duty under the FCRA as it relates to this case[.]"). Summary judgment is warranted on Plaintiff's claim for negligent violations of the FCRA based on being denied a student loan.

## IV.   Conclusion

Based on the foregoing reasons and cited authority, the undersigned **RECOMMENDS** that Defendant NCS' motion [Doc. 48] for summary judgment be **GRANTED IN PART AND DENIED IN PART**.

It is **RECOMMENDED** that Defendant's summary judgment motion [Doc. 48] be **GRANTED** on Plaintiff's § 1681s-2(b) FCRA claim for negligence based on being denied a student loan in August 2014.

It is **RECOMMENDED** that Defendant's summary judgment motion [Doc. 48] be **DENIED** on Plaintiff's § 1681s-2(b) claim against Defendant NCS for: (1) willful violations of the FCRA; and (2) negligent violations of the FCRA for damages based on emotional distress, the $942.35 payment made to JAI by Plaintiff, and the security deposit for the apartment required by Camden Vantage.

All pretrial matters have been concluded with the issuance of this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1), this Court's Local Rule

34

72.1, and Standing Order 14-01 (N.D. Ga. August 15, 2014).  The Clerk, therefore, is

**DIRECTED** to terminate the reference to the Magistrate Judge.

 **SO RECOMMENDED**, this 27th day of November, 2017.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

35